IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AMANDA WATSON,<br><br>    Plaintiff,<br><br>v.<br><br>ENABLEUTAH; GAVIN HUTCHINSON; and SUE BARKER,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO COMPEL ARBITRATION**<br><br>Case No. 1:24-cv-00176-JNP-JCB<br><br>District Judge Jill N. Parrish |

Plaintiff Amanda Watson was an employee of Defendant EnableUtah from 2021 to 2024. During those three years, she alleges, she was subjected to pervasive sex-based discrimination, harassment, and abuse. After she was terminated, she obtained a right-to-sue letter from the Equal Employment Opportunity Commission and filed this action claiming sex discrimination and sexually hostile work environment, among other things. Defendants, pointing to an arbitration clause in her Employee Handbook, now move to compel arbitration. Ms. Watson argues that the arbitration clause is an illusory promise because the company retained the right to change the contents of the handbook at its discretion at any time for any reason; therefore, she presses, the arbitration clause is unenforceable. Defendants reply that her challenge is an issue for the arbitrator to decide.

Tenth Circuit authorities support both Ms. Watson's and Defendants' positions, making the issue appear more complicated than it really is. The simple answer is that Ms. Watson's challenge goes to the formation of the parties' employment contract—an issue for the court, not

arbitrator, to decide—and that the company's illusory promise means that no contract was formed in the first place. Accordingly, the court DENIES Defendants' motion to compel arbitration.

## BACKGROUND

The court recounts the factual background "in the light most favorable to the party opposing arbitration." *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th Cir. 2014). In September 2021, Amanda Watson was hired by EnableUtah to work as an executive assistant to Defendant Gavin Hutchinson, EnableUtah's CEO. She was provided a copy of the EnableUtah Employee Handbook, which contained the following mandatory-arbitration clause:

> If a dispute is not resolved by following the in-house dispute resolution procedure it will be resolved by way of mediation and, if necessary, binding arbitration. As a condition of employment, all EnableUtah employees will be required to agree to abide by this policy. This policy governs the resolution of any and all claims, disputes, and other controversies [a]rising out of, or relating in any way, to the employment relationship between EnableUtah and its employees.

ECF No. 16-1, at 4–5. Accompanying the Handbook was a page titled "Employee Handbook Acknowledgement," which contained one statement disclaiming intent to contract and another reserving to the company the right to change the terms of the Handbook unilaterally. The former read,

> I understand that this handbook is not intended to create, and should not be construed as creating, a contract between EnableUtah and me. No contractual relationship will arise unless an express written contract is signed b[y] the President/CEO, who is the only representative authorized to enter into such a relationship, and me.

*Id.* at 8. The second statement immediately followed: "I understand that the contents of this handbook may be changed at the company's discretion at anytime [sic] for any reason." *Id.* Ms. Watson signed the page acknowledging that she had received the Handbook once soon after she was hired and then again in January 2022 and January 2023.

During her employment at EnableUtah, Ms. Watson was repeatedly discriminated against, harassed, and abused on the basis of her sex. For example, Mr. Hutchinson—her direct supervisor—frequently commented on her (perceived) sex life and expressed his desire that she be abstinent. He would also physically intimidate her in her office by screaming at her and belittling her. And when Ms. Watson requested a raise after learning that she was substantially underpaid, Mr. Hutchinson agreed but only on the condition that she sign a special morality contract no other employee was required to sign (he believed that she was involved in sex work).

The abuse didn't stop there. Once, Ms. Watson was sexually assaulted by an EnableUtah donor. She reported the incident to Mr. Hutchinson, who demanded that she continue to interact with her assailant in person, adding that she "better hope [the assailant] does it again and that this time there are witnesses." ECF No. 2, at 5. Ms. Watson informally reported Mr. Hutchinson's behavior to EnableUtah's HR department and informed HR that she would make a formal report the next day. Soon after she arrived at work the next day, Mr. Hutchinson barged into her office and screamed at her to go home. She was thus forced out of her employment before she could formally report Mr. Hutchinson's inappropriate actions.

Ms. Watson then filed a charge of discrimination with the Equal Employment Opportunity Commission and received a right-to-sue letter. Based on the letter, she timely filed this action, claiming sex discrimination, sexually hostile work environment, retaliation, and negligent employment against EnableUtah; false imprisonment and assault against EnableUtah and Mr. Hutchinson; and intentional infliction of emotional distress against all three Defendants (Sue Barker, the third Defendant, was an EnableUtah employee with a supervisory role over Ms. Watson).

After Ms. Watson filed her federal lawsuit, Defendants moved to compel arbitration based on the mandatory-arbitration clause contained in the Handbook. In their view, Ms. Watson agreed to abide by the Handbook's arbitration clause as a condition of her employment, and no grounds for revocation exist. According to Ms. Watson, the arbitration provision means nothing—in legal speak, it is illusory—because the Handbook gives Defendants an unrestricted right to change any term for any reason at any time. Accordingly, Ms. Watson argues that the arbitration clause is unenforceable. Defendants in reply argue that whether the change-in-terms clause renders the arbitration agreement illusory is an issue for the arbitrator, not the court, to decide.

## DISCUSSION

The court begins with the threshold issue of who gets to decide whether the parties' arbitration agreement was based on an illusory promise. The Utah Uniform Arbitration Act, which governs this dispute, provides that "[a]n agreement [to arbitrate] any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." UTAH CODE ANN. § 78B-11-107(1). The text reflects the core principle that "arbitration is a matter of contract." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 147 (2024). From this principle follows another, that "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). A party who has not agreed to arbitrate a dispute cannot be forced into arbitration, so "the first question in any arbitration dispute must be: What have these parties agreed to?" *Coinbase*, 602 U.S. at 148. The Utah Uniform Arbitration Act accordingly directs courts to "decide [initially] whether an agreement to arbitrate exists" and, only if so, then leaves it for the arbitrator to decide "whether a contract containing a valid agreement to arbitrate is enforceable."

*Id.* § 78B-11-107(2), (3). In short, courts resolve questions about contract formation; arbitrators resolve questions about contract enforceability.

A brief overview of contract law is helpful for understanding the distinction between contract formation and contract enforceability. As first-year law students learn, an enforceable contract is formed by "mutual assent upon a bargained-for exchange"—that is, offer, acceptance, and adequate consideration. *Rossi v. University of Utah*, 496 P.3d 105, 112 (Utah 2021). Consideration refers to a "legal detriment" on the part of the promisor. *Sugarhouse Fin. Co. v. Anderson*, 610 P.2d 1369, 1372 (Utah 1980). In the context of arbitration clauses in employment contracts, "consideration for one party's promise to arbitrate is [often] the other party's promise to do the same." *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1131 (7th Cir. 1997).

Although just a slight detriment may suffice (as the celebrated peppercorn theory of consideration illustrates), the promisor must incur some minimal detriment. As the Utah Supreme Court has explained, when "a statement [is] made in such vague or conditional terms that the person making it commits himself to nothing, the alleged 'promise' is said to be 'illusory'" and cannot function as consideration. *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1036 (Utah 1985). Assume for example that a woman wishes to borrow her neighbor's KitchenAid stand mixer to bake dessert for the upcoming family reunion she is hosting. The neighbor agrees to lend the stand mixer, and the woman agrees to compensate the neighbor with two homemade pies if the stand mixer streamlines her culinary preparations to her satisfaction. The day before the neighbor is to deliver the stand mixer to the woman, he backs out, saying he needs it to make pizza for his daughter's birthday party. If the woman attempts to sue to enforce her neighbor's promise, the court will reject her claim because her return promise was illusory. By promising to repay her neighbor in pies (of unspecified flavor or size) only if the stand mixer lives up to her undefined

expectations, she has bound herself to nothing at all. No meaningful promise, no consideration, no contract formed.

Enforceability, by contrast, concerns whether a properly formed contract may be enforced by one party against another. Properly formed contracts may be unenforceable for any number of reasons. Imagine for instance that a candidate for local office makes a contract to eliminate his opposition. He agrees to supply the gun and pay $10,000; his hitman agrees to pull the trigger. Imagine further that after the candidate has supplied the gun and the money, the hitman has a change of heart and refuses to fire the fatal bullet. If the candidate sues, the court will decline to enforce the contract because it has an illegal purpose (and will likely refer the candidate to be criminally prosecuted for attempted murder). A court may similarly decline to enforce a contract on the basis that it is contrary to public policy or that it is impossible to perform. *See, e.g.*, *Zion's Serv. Corp. v. Danielson*, 366 P.2d 982 (Utah 1961) (public policy); *Quagliana v. Exquisite Home Builders, Inc.*, 538 P.2d 301 (Utah 1975) (impossibility).

Other properly formed contracts may be voidable by one party, meaning that one party can choose whether to rescind the contract or to enforce it. An otherwise-valid contract made with someone who lacks legal capacity to contract (like a minor) is voidable by the person lacking the capacity to contract. *See Bowling v. Sperry*, 184 N.E.2d 901 (Ind. App. 1962). Fraud works similarly—the party to whom a fraudulent misrepresentation is made may elect to rescind the contract, but if that party performs his side of the bargain, he can enforce the contract against the party who made the misrepresentation. Suppose a crafty musician promises to sell his elderly neighbor his Steinway & Sons grand piano for $30,000. He represents that it is in perfect playing condition when in reality it needs $15,000 worth of repairs to be playable. The neighbor discovers the defect immediately after the musician has it delivered to her house. She may choose to rescind

the contract and get her money back, or she may elect to keep the piano. (Perhaps her wealthy cousin is willing to pay $60,000 for a piano like that, so she figures she could turn a $15,000 profit by getting it repaired and selling it on to him.)

Contract formation is not an issue in either the murder-for-hire or the piano example; a challenge to enforceability assumes that a properly formed contract already exists. With this background in mind, consider Ms. Watson's particular challenge to the arbitration clause she signed in the Handbook. The terms of that clause in isolation bound both Ms. Watson and the company to arbitrate any disputes that arose out of their employment relationship. But the handbook-receipt acknowledgement she signed retained for the company the right to change the contents of the Handbook "at [its] discretion at anytime [sic] for any reason." ECF No. 16-1, at 8. As Ms. Watson sees it, thanks to this get-out-of-jail-free provision, EnableUtah for its part did not meaningfully promise to resolve employment disputes with its employees through arbitration—in other words, the company's promise to arbitrate was illusory.

Although she styles her challenge as one going to enforceability of the arbitration provision, it really goes to contract formation. What Ms. Watson is saying is essentially that because her employer's reciprocal promise to arbitrate was illusory, a valid agreement to arbitrate did not exist between her and her employer in the first place. Her challenge therefore is one that should be resolved by the court, not the arbitrator. *See* UTAH CODE ANN. § 78B-11-107(2) ("The court shall decide whether an agreement to arbitrate exists . . . ."). Many courts, including the Tenth Circuit in *Dumais v. American Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002), have faced similar challenges to arbitration clauses accompanied by similar change-of-terms clauses and arrived at

the same conclusion.[1] *See, e.g.*, *Johnson v. Cont'l Fin. Co.*, 131 F.4th 169, 175, 178 (4th Cir. 2025); *Floss v. Ryan's Fam. Steak Houses, Inc.*, 211 F.3d 306, 315 (6th Cir. 2000); *Gibson*, 121 F.3d at 1133 (Cudahy, J., concurring); *see also McNally Pittsburg, Inc. v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*, 812 F.2d 615, 620 (10th Cir. 1987) ("Because the duty to arbitrate arises, if at all, from a contract, a court cannot compel arbitration without first confirming that a[n] . . . agreement containing such a duty does in fact exist.").

Defendants resist this conclusion, arguing that under the Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, the question whether the arbitration agreement is illusory is one for the arbitrator to decide. 388 U.S. 395 (1967). They also observe that *Dumais* did not engage with *Prima Paint* and so suggest that it is inconsistent with *Prima Paint*, or at least that it is flimsy authority for this case. A brief sketch of *Prima Paint* and *Dumais* is necessary to understand their argument.

Begin with *Prima Paint*. That case concerned a company that sued in federal court to rescind its consulting agreement with another company on the ground that the other company had fraudulently represented that it was solvent when it was actually insolvent and about to file bankruptcy. *Prima Paint*, 388 U.S. at 397–98. The defendant company, pointing to the broad

---

[1] Most of these courts applied the Federal Arbitration Act because the parties' agreements involved interstate commerce. Here, no one disputes that the Utah Uniform Arbitration Act, not the Federal Arbitration Act, governs because the parties' employment contract did not affect commerce outside Utah, at least not in the way the federal statute contemplates. Although the Federal Arbitration Act and the Utah Uniform Arbitration Act are not identical, they contain sufficiently similar language that the cases applying federal law are relevant, persuasive authority for this case. *See* 9 U.S.C. § 4 ("The court . . . [,] *upon being satisfied that the making of the agreement for arbitration . . . is not in issue*, . . . shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." (emphasis added)); UTAH CODE ANN. § 78B-11-107(2) ("The court shall decide *whether an agreement to arbitrate exists* . . . ." (emphasis added)).

arbitration clause in the consulting agreement, moved to compel arbitration. The Court sided with the defendant and held,

> [I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the [Federal Arbitration Act] does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Id.* at 403–04 (footnote omitted). In distinguishing a challenge to an arbitration provision specifically from a challenge to a contract generally, the Court established a severability doctrine—that "an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006).

Now turn to *Dumais*, whose facts closely resemble those in this case. In *Dumais*, a former employee who worked at a golf course sued her former employer alleging harassment, discrimination, and wrongful discharge. The defendant employer pointed to the arbitration clause in the employment handbook and moved to compel arbitration. *Dumais*, 299 F.3d at 1217–18. The plaintiff responded by arguing that the handbook's change-in-terms agreement, which allowed the employer to change any provision of the handbook at will, rendered the arbitration agreement illusory. The court, without analyzing whether the arbitration provision was severable from the remainder of the contract, agreed and "join[ed] other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or scope is illusory." *Id.* at 1219.

*Dumais* did not attempt to distinguish *Prima Paint*; indeed, it did not even cite it. Defendants suggest that *Dumais* consequently stands in tension with *Prima Paint* and urge this court to follow *Prima Paint* by analyzing whether Ms. Watson's challenge goes to the arbitration agreement specifically or to the handbook as a whole. Defendants overread *Prima Paint*, though

their argument is understandable given that the two sentences from *Prima Paint* quoted above have led numerous courts faced with facts like the ones in this case to invoke the severability doctrine and ask whether the illusoriness challenge goes to the arbitration agreement specifically or to the contract generally. And where the change-in-terms provision was not specific to the arbitration agreement, these courts have granted motions to compel arbitration. *See, e.g.*, *In re Cox Enters., Inc., Set-Top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1209–11 (10th Cir. 2016); *Pagano v. NordicTrack, Inc.*, 749 F. Supp. 3d 1183, 1195–96 (D. Utah 2024) (Parrish, J.). Put differently, many courts have derived from *Prima Paint* a general severability doctrine to be applied in all challenges to arbitration clauses. These decisions, though, confuse the distinction between challenges to contract formation (where severability is not relevant) and challenges to contract enforcement (where severability is relevant), and consequently confuse the distinct roles for the court and the arbitrator. Careful attention to the claims raised in *Prima Paint* and *Dumais* indicates that the former's severability doctrine is limited to challenges to enforcement (or validity), and illuminates why *Dumais* is entirely consistent with *Prima Paint*.

    *Prima Paint* involved a claim of fraud in the inducement regarding substantive provisions of the parties' agreement. As illustrated by the piano example above, a party who has been induced to enter a contract by a fraudulent misrepresentation may either rescind the contract or affirm it. *Dugan v. Jones*, 615 P.2d 1239, 1247 (Utah 1980), *superseded on other grounds by statute as recognized in Arnold v. Curtis*, 846 P.2d 1307, 1309–10 (Utah 1993). A claim of fraud in the inducement is thus a defense to contract enforcement, not a challenge to contract formation. A dispute about contract enforceability (or validity) "requires . . . discern[ing] which parts [of] the agreement are [enforceable; w]hen a contract contains some [enforceable] provisions and some [unenforceable] ones, the court must decide if it can sever the [unenforceable] provisions and

enforce the rest of the agreement." *Johnson*, 131 F.4th at 176; *see also* Mark L. Movsesian, *Severability in Statutes and Contracts*, 30 GA. L. REV. 41, 47–48 (1995) ("A court will [generally] sever an illegal term and enforce the remainder of an otherwise valid contract . . . ."). And when the parties have an otherwise-valid arbitration agreement, the question of which provisions in the contract are enforceable and whether the unenforceable provisions can be severed becomes an issue for the arbitrator, not the court. *Cf.* UTAH CODE ANN. § 78B-11-107(3) ("An arbitrator shall decide . . . whether a contract containing a valid agreement to arbitrate is enforceable."). In short, *Prima Paint* involved a question of contract enforceability generally, so it is no surprise that the Supreme Court, relying on the parties' otherwise-valid arbitration agreement, sent their dispute to arbitration.

*Dumais* on the other hand involved a claim of illusoriness, which as previously explained goes to contract formation. And as noted above, a question of contract formation is for the court to decide. *Cf.* UTAH CODE ANN. § 78B-11-107(2) ("The court shall decide whether an agreement to arbitrate exists . . . ."). A challenge to contract formation, unlike a challenge to contract enforceability, does not raise the severability question because if no contract was formed, then "there is no agreement from which any provision, including an arbitration clause, can be severed." *Johnson*, 131 F.4th at 177. Indeed, "[t]here is nothing to enforce if a contract never existed." *Id.* at 176. The result in *Dumais* follows naturally from these principles of contract law, and nothing in *Prima Paint* requires a different outcome because *Prima Paint* did not address contract formation.[2]

---

[2] Post–*Prima Paint* decisions from the Supreme Court confirm this view. In *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643 (1986), for example, the Court expressly reiterated that "the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Id.* at 649. And when the Court has discussed the severability doctrine, it has done so only in the context of contract enforceability, like in *Buckeye Check Cashing, Inc.*

11

In sum, *Prima Paint* and *Dumais* addressed distinct issues, and the holding in *Dumais* is consistent with that in *Prima Paint*. The issue in *Dumais* very closely resembles the issue in this case, and the court follows its lead in holding that it is for the court to resolve Ms. Watson's illusoriness challenge.[3]

---

*v. Cardegna*, 546 U.S. 440 (2006). In *Buckeye*, the Court expanded on the distinction between claims "challeng[ing] specifically the validity of the agreement to arbitrate" and claims "challeng[ing] the contract as a whole," describing these as "two types" of "[c]hallenges to the validity of arbitration agreements." *Id.* at 444. Note that the Court described these two types of claims as challenges "to the *validity*" of arbitration agreements. *Id.* (emphasis added). And in that discussion, the Court invoked the Federal Arbitration Act's language that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity *for the revocation of any contract*." 9 U.S.C. § 2 (emphasis added). A claim seeking revocation of a contract is a challenge to its enforceability (or validity), not formation; there would be no contract to revoke if a contract were never formed in the first place. Indeed, the *Buckeye* Court in a footnote specified that "[t]he issue of the contract's validity is different from the issue whether any agreement between the [parties] was ever concluded" and that "its opinion . . . addresse[d] only the former." *Buckeye*, 546 U.S. at 444 n.1.

[3] Muddying the landscape is the Tenth Circuit's decision in *In re Cox Enterprises, Inc., Set-Top Cable Television Box Antitrust Litigation*, 835 F.3d 1195 (10th Cir. 2016). That case involved a fact pattern similar to the one here and the one in *Dumais*: Subscribers of the defendant cable service sued in district court, alleging an illegal tying arrangement between the defendant's premium cable service and its set-top-box rental service. *Id.* at 1199–1200. The defendant moved to compel arbitration, pointing to an arbitration clause in the subscriber agreements, and the plaintiffs responded by claiming illusoriness based on a broad change-in-terms provision. The court recognized that "the notion of an illusory promise is simply part of the doctrine of consideration" and that *Dumais* supported denying the motion to compel arbitration. *Id.* at 1211–12. It noted, however, that *Dumais* did not cite *Prima Paint* or discuss its severability analysis; like Defendants do here, the court reasoned that *Dumais* was therefore not binding precedent on the issue presented.

As explained in this court's discussion above, it is *Dumais*, not *Prima Paint*, that is on point for the issue raised by Ms. Watson. Insofar as *Dumais* and *In re Cox* conflict, the court is "obligated to follow the earlier panel decision over the later one." *Hiller v. Okla. ex rel. Used Motor Vehicle & Parts Comm'n*, 327 F.3d 1247, 1251 (10th Cir. 2003). Fortunately, *Dumais* is the earlier panel decision, so the court's outcome here is faithful to both Supreme Court and binding circuit precedent.

Utah contract law governs the merits of Ms. Watson's illusoriness claim. Under Utah law, once again, "[w]hen . . . a statement [is] made in such vague or conditional terms that the person making it commits himself to nothing, the alleged 'promise' is said to be 'illusory' . . . [and] neither binds the person making it, nor functions as consideration for a return promise." *Res. Mgmt. Co.*, 706 P.2d at 1036 (citation omitted). Recall that EnableUtah's Employee Handbook contained an arbitration clause and that Ms. Watson signed a form acknowledging that she had received the Handbook. That acknowledgement form retained for the company the right to change the contents of the Handbook "at [its] discretion at anytime [sic] for any reason." ECF No. 16-1, at 8.

The court agrees with Ms. Watson that with such a broad change-in-terms clause, EnableUtah failed to commit itself to following any of the policies outlined in its Handbook, including the arbitration provision, and thus made an illusory promise. Defendants do not argue otherwise. The company's illusory promise was not consideration for Ms. Watson's promise to abide by the arbitration clause, so Ms. Watson is not legally bound by her promise. Courts across the country applying similar state laws to similar facts have reached the same conclusion. *See, e.g.*, *Dumais*, 299 F.3d at 1219; *Johnson*, 131 F.4th at 179; *Floss*, 211 F.3d at 315; *Gibson*, 121 F.3d at 1133 (Cudahy, J., concurring). And if any doubt about the illusoriness of EnableUtah's promise remained, the company itself said that nothing in the Handbook should be construed as an enforceable promise: "[T]his handbook is not intended to create, and should not be construed as creating, a contract between EnableUtah and [the employee]." ECF No. 16-1, at 8. To bind Ms. Watson with language that expressly "allows [the company] to escape all of its contractual obligations at will" would not only be out of step with the law but also work a manifest injustice to Ms. Watson. *Johnson*, 131 F.4th at 179.

## CONCLUSION AND ORDER

For the reasons above, the court **DENIES** Defendants' motion to compel arbitration.

Signed June 9, 2025.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge